# FOR PUBLICATION

**FILED & ENTERED**

**JAN 13 2025**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY Pgarcia    DEPUTY CLERK**

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

|  |  |
|---|---|
| In re:<br><br>MICHAEL DEVON BOWERS,<br><br><br><br><br><br>Debtor. | Case No.: 1:24-bk-10935-VK<br><br>Chapter 7<br><br>**MEMORANDUM OF DECISION DENYING MOTION FOR DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(k); AND CONTEMPT PURSUANT TO 11 U.S.C. § 105(a)**<br><br>Date:   January 8, 2025<br>Time:   9:30 a.m.<br>Place:  Courtroom 301<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA 91367 |

For the reasons set forth below, the Court will deny *Debtor's Motion for: (a) Damages for Violation of Automatic Stay Pursuant to 11 U.S.C. § 362(k); and (b) Contempt Pursuant to 11 U.S.C. § 105(a)* (the "Motion") [doc. 33].

///

///

# I.      BACKGROUND

## A.      The State Court Action

In October 2023, Michael Bowers ("Debtor") entered into a lease agreement with The Weddington ("Weddington"), predecessor of OZH Holding 1, LLC ("OZH"), to rent the apartment located at 11058 Chandler Blvd., Unit 3051E, Los Angeles, CA 91601 (the "Apartment") beginning on October 19, 2023. Exh. A to the Declaration of Alixandra Solis ("November Solis Decl.") [doc. 38]. In accordance with the Lease Agreement, Debtor was required to pay Weddington (and later, OZH) rent payments in the amount of $2,321.00 per month on or before the third of each month. *Id.*, p. 2.

In addition, the Lease Agreement provided that Debtor would "be obligated to pay to [the lessor] a fee of $100 if you fail to pay any amount due under this Contract." *Id.* As concerns default by Debtor, specifically regarding legal fees, the Lease Agreement states:

> Upon your default, we will have all other legal remedies including lease termination, lockout under statute, and the remedy set forth in Civil Code § 1951.2. The prevailing party may recover from a non-prevailing party attorney's fees and costs of litigation in an amount of no more than $1800.

Lease Agreement, attached as Exh. A to the November Solis Decl., p. 9.

Under the Lease Agreement, Debtor provided Weddington with a security deposit in the amount of $2,821.00 (the "Security Deposit"). *Id.*, p. 1. Regarding the lessor's potential application of the Security Deposit, the Lease Agreement states:

> 52. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES…We may withhold from the security deposit only such amounts as are reasonably necessary to remedy your defaults including, but not limited to, the following:
>
> a) Defaults in the payment of rent;
> b) To repair damage to the premises caused by you, exclusive of ordinary wear and tear, and/or;
> c) To clean the premises, if necessary, upon termination of the tenancy in order to return the unit to the same level of cleanliness it was in at the inception of the tenancy, and/or;
> d) To restore, replace, or return personal property or appurtenances, exclusive of ordinary wear and tear.

53. DEPOSIT RETURN, SURRENDER, AND ABANDONMENT. You are required to provide us written notice of your forwarding address, on or before termination of this [Lease Agreement]. We'll mail you, to the forwarding address you provide, your security deposit refund (less lawful deduction) and an itemized accounting of any deductions within 21 days after surrender or abandonment, unless statutes provide otherwise. If you fail to provide us with your forwarding address in writing, as required above, we will process the unclaimed security deposit in accordance with state law…

*Id.*, p. 12.

Subsequently, Debtor fell behind on his monthly lease payments. November Solis Decl., ¶ 5. On February 5, 2024, Greystar, acting as property management agent on behalf of OZH, served a notice to pay rent in 3 days or to quit in 30 days on Debtor (the "Notice to Quit"). *Id.* and Exh. B thereto. Debtor did not cure his arrears on the lease payments or vacate the Apartment within three days. *See id.*, ¶ 5. On March 15, 2024, OZH initiated an unlawful detainer action against Debtor in the Superior Court of California, County of Los Angeles, case no. 24PDUD00964 (the "State Court Action"). *See id.*

In April 2024, Debtor and OZH entered into a stipulation for entry of judgment in the State Court Action (the "Stipulated Judgment"). *Id.*, ¶ 6 and Exh. C thereto; *see also* Exh. C to the Declaration of Michael DeVon Bowers ("November Bowers Decl.") [doc. 33]. The Stipulated Judgment provided, in part, for a judgment of possession of the Apartment. In addition, the Stipulated Judgment provided, in relevant part:

1.    JUDGMENT. Judgment shall immediately enter in favor of Plaintiff and against Defendant for:…(c) past due rent in the amount of $2,672.99; (d) rental holdover damages in the amount of $7,917.76; (e) attorneys fees in the amount of $1,535.87 and (f) costs in the amount of $450.00, for a total judgment in the amount of $14,112.49….

2.    CONDITIONAL REINSTATEMENT OF LEASE. Plaintiff agrees to forbear on its right to enforce the judgment entered in this action and any Writ of Possession/Execution issued thereon provided Defendant complies with all of the following conditions:

a.    PAYMENTS. Defendant pays Plaintiff the following amounts on or before the following dates:

April 19, 2024………………..…$2,576.67
May 1, 2024……………………$5,767.91
June 1, 2024………………...…$5,767.91

AND

b.      COMPLIANCE WITH LEASE. Defendant observes and performs all of Defendant's other obligations under the Lease, including making all lease payments and utility payments on the first of each month, together with any addenda, amendments and rules and regulations as if the Lease had not been terminated.

If Defendant complies with foregoing conditions, then upon full payment of all amounts set forth in this Paragraph 2, the Lease shall be deemed reinstated.

**The payments set forth in this Paragraph 2 are intended to cover rent for the Premises through and until April 22, 2024** plus attorneys fees and costs incurred by Plaintiff in connection with this unlawful detainer action. All payments required by this Stipulation shall be made in the form of a cashier's check or money order. To reinstate the Lease, Defendant must comply with all of the foregoing conditions, including, but not limited to, timely making <u>all</u> payments set forth in this Paragraph 2.

3.      NONCOMPLIANCE. If Defendant fails to comply with any of the conditions set forth in Paragraph 2 of this Stipulation, then in addition to Plaintiff's other rights and remedies, Plaintiff may, without further notice, enforce the judgment entered in this action and any Writ of Possession/Execution issued thereon including, without limitation, proceeding with a Sheriff lockout at the Premises.

Stipulated Judgment, attached as Exhibit C to both the November Solis Decl. and the November Bowers Decl., ¶¶ 1-3 (emphasis added).

### B.      *The Bankruptcy Case*

On June 10, 2024, Debtor filed a chapter 7 petition, initiating case no. 1:24-bk-10935-VK (the "Case"). In his voluntary petition, Debtor indicated that his landlord had obtained an eviction judgment against him.

In his schedule A/B, Debtor identified his personal property, including a couch, a TV, a cell phone, a laptop, clothes and shoes, costume jewelry, cash and an EDD Money Mart card.

-4-

Debtor stated that his personal property had an aggregate value of $1,230.00. In his schedule A/B, Debtor did not disclose a security deposit.

In his list of creditors, Debtor included OZH and Weddington; in his schedule G, Debtor disclosed his lease with Weddington. In his schedule E/F, Debtor did not disclose a debt owed to Weddington or OZH.

With his chapter 7 petition, Debtor filed an *Initial Statement About an Eviction Judgment Against You* (the "Initial Statement") [doc. 5], and he submitted a rental deposit in the amount of $2,319.00[1] with the clerk of the Court. *See* doc. 8. In the Initial Statement, Debtor stated that he rented the Apartment and that his landlord had obtained a judgment for possession against him in an eviction, unlawful detainer action or similar proceeding. Initial Statement, p. 1. In addition, Debtor certified that: (1) under the state or other nonbankruptcy law that applies to the judgment for possession, Debtor had the right to stay in the Apartment by paying his landlord the entire delinquent amount; and (2) he had given the bankruptcy court clerk a deposit for the rent that would be due during the 30 days after the petition was filed. *Id.*

The Initial Statement explained, in relevant part, that:

Stay of Eviction:      **(a)**     **First 30 days after bankruptcy.** If you checked both boxes above, signed the form to certify that both apply, and served your landlord with a copy of this statement, the automatic stay under 11 U.S.C. § 362(a)(3) will apply to the continuation of the eviction against you for 30 days after you file your *Voluntary Petition for Individuals Filing for Bankruptcy* (Official Form 101).

                                  **(b)**     **Stay after the initial 30 days.** If you wish to stay in your residence after that 30-day period and continue to receive the protection of the automatic stay under 11 U.S.C. § 362(a)(3), you must pay the entire delinquent amount to your landlord as stated in the eviction judgment before the 30-day period ends. You must also fill out *Statement About Payment of an Eviction Judgment Against You* (Official Form 101B), ***file it*** with the bankruptcy court, ***and serve your landlord a copy of it before the 30-day period ends***.

---

[1] Given that Debtor's monthly rental payment is $2,321.00 under the Lease Agreement, it is unclear why Debtor deposited $2,319.00. *See* Lease Agreement, attached as Exh. A to the November Solis Decl., p. 2.

*Id.* (bolded emphases in original, bolded italicized emphases added).

No later than July 10, 2024, Debtor was required to pay the entire delinquent amount in the Stipulated Judgment to OZH, fill out a *Statement About Payment of an Eviction Judgment Against You* (Official Form 101B) (the "Payment Statement"), file the Payment Statement with the Court and serve a copy of it on OZH.  In Debtor's declaration filed in support of the Motion, Debtor states that: (1)  a "true and correct copy of the certified check receipt for the full and final payment of the stipulation agreement" is attached as Exhibit F (the "Check Receipt"); (2) a "true and correct copy of the letter of reinstatement of lease/vacate judgment request sent to the landlord, per the stipulation agreement that shows that I complied with the Certificate, Official Form 101B" is attached as Exhibit G; and (3) a "true and correct copy of form 101B – Statement About Payment of an Eviction Judgment Against You" is attached as Exhibit H.  November Bowers Decl., ¶¶ 20-22, 24.  The Check Receipt appears to have been provided by Priority One Credit Union, and it states that the amount of the check is $5,767.91.  However, in his declaration, Debtor does not state that he paid this amount to OZH by **July 10, 2024**, nor does Debtor provide documentary evidence that he timely delivered this amount to OZH.  Similarly, Debtor does not state that he actually served a copy of the Payment Statement on OZH by **July 10, 2024**, nor does Debtor provide documentary evidence that he timely served a copy of the Payment Statement on OZH.[2]

On September 9, 2024, nearly two months after the mandatory deadline to do so, Debtor filed the Payment Statement [doc. 24].  Debtor's signature on the Payment Statement is dated September 6, 2024.  In the Payment Statement, Debtor certified that, within 30 days after Debtor filed his voluntary petition, Debtor paid his landlord the entire amount he owed as stated in the judgment for possession.  *See also* Payment Statement [Exhibit H to  November Bowers Decl.], p. 1.

---

[2] In comparison, attached as Exhibit J to the November Bowers Decl. is a letter allegedly sent by Debtor to notify OZH that its actions were a violation of the automatic stay, together with a receipt from the United States Postal Service, dated August 29, 2024, with a tracking number.

On September 23, 2024, the Court entered Debtor's discharge (the "Discharge") [doc. 25].[3]  The next day, the Case was closed.  In October 2024, on Debtor's request, the Court reopened the Case [doc. 31].

### C.    The Eviction

On or around August 16, 2024, more than one month after the deadline for Debtor to file and serve the Payment Statement, the County of Los Angeles Sheriff's Department posted a 5-day notice to vacate the Apartment (the "Notice to Vacate") on the front entrance to the building containing the Apartment.  November Bowers Decl., ¶ 11 and Exh. N thereto.  On August 20, 2024, the Sheriff's Department reposted the Notice to Vacate on the Apartment's door.  *Id.*

On August 28, 2024, Debtor received an email from Greystar inquiring as to whether Debtor still resided at the Apartment (the "August 28 Email").  *Id.*  On or around September 12, 2024, the Sheriff's Department evicted Debtor from the Apartment.  *See* November Bowers Decl., ¶ 11 and Exh. O thereto.  The same day, Debtor received an email from Greystar which stated that Debtor's access to the Apartment had been removed and that Debtor could schedule a time to retrieve his belongings from the Apartment within the next 14 days.  *See* Exh. O to the November Bowers Decl.  Greystar requested that Debtor email Greystar with a date and time when Debtor would be available to retrieve his belongings.  *Id.*

### D.    Activity Following the Close of the Case

On September 25, 2024, Debtor sent an email to Greystar and stated that he would be available to collect his belongings on September 26, 2024.  Exh. Q to November Bowers Decl.  On September 25, 2024, Greystar responded to Debtor via email and advised him to go to the leasing office so that maintenance could take Debtor to the Apartment.  *Id.*

On September 26, 2024, Debtor went to the Apartment to retrieve his belongings.  November Bowers Decl., ¶ 12.  On September 27, 2024, Debtor sent Greystar an email asserting that items were missing from the Apartment and attached a note setting forth the alleged missing

---

[3] On July 29, 2024, the chapter 7 trustee had filed a no distribution report in the Case.

items (the "Missing Items Letter").  November Bowers Decl., ¶ 12 and Exh. Q thereto.  In addition, in this email, Debtor requested the return of the Security Deposit.  *Id.*

On October 4, 2024, Greystar sent Debtor an email (the "October 4 Email") stating that "[t]here is a remaining balance of $7,176.79 that needs to be settled" and that "if the payment is not made within 30 days after receiving this notice, we will have to send your file to collections." Exh. R to November Bowers Decl.

### E.    The Motion

On November 5, 2024, Debtor filed the Motion and his supporting declaration [doc. 33], and a hearing was set for November 27, 2024.  In the Motion, Debtor asserts that he cured the entire monetary default that gave rise to the Stipulated Judgment on July 1, 2024.  Debtor further contends that he complied with 11 U.S.C. § 362(l) and that the following actions of OZH, Weddington and Greystar consequently constituted a violation of the automatic stay: (1) the August 16 and 20, 2024 postings of the Notice to Vacate; (2) the August 28 Email; (3) the eviction; (4) removing Debtor's items from the Apartment on September 25, 2024; and (5) the October 4 Email.

Debtor requests that the Court hold OZH in contempt for violation of the automatic stay and award actual damages in the amount of $25,517.10, $5,000 in emotional damages and $20,000 in punitive damages.  Debtor also requests that the Court order OZH to remove the Stipulated Judgment from Debtor's credit report and the eviction from Debtor's consumer report and rental history.

With respect to Debtor's alleged actual damages, in his declaration, Debtor states, in pertinent part:

> I incurred $238.52 in travel expenses dealing with the violation of the automatic stay by: driving 126 miles back and forth to the Pasadena Courthouse; I drove 230 miles roundtrip to the Woodland Hills Bankruptcy Court Self-Help Center for assistance and filing this motion. This is 356 miles. Mileage costs calculated at the standard IRS rate of $0.67 per mile.
>
> I incurred $960.00 in lost wages because I could not work while dealing with the

violation of the automatic stay by taking time from work to go to the courthouses and the sheriff's office. This is a total of 30 hours missed, at $32.00/hour.

I incurred $1,170.00 in damages because I had to pay for a hotel stay for nine (9) nights at $130.00 per night, and purchase food and clothes in the amount of $225.

I incurred $13,148.58 in damages from rent payments to satisfy the stipulation agreement and to the bankruptcy court that they accepted, yet never credited to my account until after they illegally evicted me.

November Bowers Decl., ¶¶ 7-10.  In addition, in the Motion, Debtor contends that he incurred approximately $5,000 in damages for items that were removed from the Apartment. Debtor further asserts that he anticipates incurring an additional $5,000 in housing costs as a result of the eviction showing on his rental history and potential identify theft, because documents containing personally identifiable information were missing from the Apartment, after Debtor returned there to remove his belongings.

As concerns Debtor's emotional damages, in his declaration, Debtor states, in relevant part:

I have suffered significant harm in the following ways: I had a panic attack and an anxiety attack that required medical attention, stemming from the embarrassment of having eviction notices placed on my door and the stress of having to figure out my legal options and how to assert them; I was diagnosed with "Adjustment disorder with depression and suicidal ideations" after being evicted, having to stay in hotels, and the impending threat of homelessness…

Id., ¶ 14.

### F.    The Opposition

On November 13, 2024, OZH filed an opposition to the Motion (the "Opposition") [doc. 36].  Among other things, OZH states that Debtor did not comply with 11 U.S.C. § 362(l) and, as a result, there was no stay in place after the initial 30-day postpetition period.  In support of the Opposition, OZH filed the November Solis Decl. and the Declaration of OZH's counsel Richard Sontag ("Sontag Decl.") [doc. 37].

In her declaration, Ms. Solis states, in pertinent part:

I am employed by Greystar, the authorized property management agent for [OZH], as the community manager of the Weddington apartment complex in North Hollywood, California….

In April 2024 the Debtor and OZH entered into a Stipulation for Entry of Judgment – Unlawful Detainer in [the State Court Action]….The [Stipulated Judgment] provided for a judgment for possession of the Premises, plus $14,112.49 in back rent, rental damages, costs and fees. The [Stipulated Judgment] also provided that if the Debtor made three payments the judgment would be vacated and the Debtor's tenancy would be reinstated. The Debtor made the first 2 payments, but failed to make the third payment.

On June 10, 2024, the Debtor filed the within bankruptcy case. At that time, the Debtor also filed an "Initial Statement About an Eviction Judgment Against You", and made a payment of $2,391.00[4] to this Court. On or about June 11, 2024, OZH received that payment from this Court.

No further payments were received from the Debtor until on or about August 5, 2024, when my office received money orders from the Debtor totaling $4,804.73.

I understand that the Debtor contends that on July 1, 2024, he sent my office a letter with a check for $5,767.91, and a "Statement About Payment of an Eviction Judgment Against You."  My office never received that letter, check or Statement.

November Solis Decl., ¶¶ 1 and 6-9.  To her declaration, Ms. Solis attached: (1) a copy of the Lease Agreement as Exhibit A; (2) a copy of the Notice to Quit as Exhibit B; and (3) a copy of the Stipulated Judgment as Exhibit C.

In his declaration, Mr. Sontag states, in relevant part:

Based on the Debtor's actions my office instructed the Sheriff's Department to cancel any "lockout" regarding the Premises. We then waited for 30 days to see if the Debtor complied with the requirements of 11 U.S.C. § 362(l). On July 11, 2024, I reviewed the PACER docket in this bankruptcy case. The docket did not show such compliance (though a Statement About Payment of an Eviction Judgment Against You was filed in this case on September 6, 2024). Additionally, at that time I was informed that OZH had not received any additional monies from the Debtor.

Based on the Debtor's failure to comply with the requirements of 11 U.S.C. § 362(l) OZH elected to move forward with the Debtor's eviction, and my office instructed the Sheriff's Department to proceed with a "lockout".

---

[4] This appears to be a typographical error; Debtor deposited $2,319 with the Court. *See* doc. 8.

1   Sontag Decl., ¶¶ 7-8.

2       **G.    *November 27, 2024 Hearing and Subsequent Declarations***

3           At the November 27, 2024 hearing on the Motion, the Court stated that OZH had not

4   explained whether the October 4 Email was based on alleged prepetition debt or postpetition debt

5   owed by Debtor to OZH.  The Court continued the hearing on the Motion so that OZH could

6   provide additional evidence which explained the basis for the October 4 Email, and so that

7   Debtor could respond to any supplemental evidence.  *See* doc. 39.

8           On December 19, 2024, OZH filed the Declaration of Alixandra Solis ("December Solis

9   Decl.") [doc. 41].  In her declaration, Ms. Solis states, in relevant part:

10

11          On or about October 19, 2023, the Debtor and OZH's predecessor in interest
            entered into a written lease agreement for the Premises (the "Lease")....Under the
12          Lease monthly rent for the Premises was $2,321.00, or $77.36 a day.
            …
13          Since filing bankruptcy the Debtor made the following payments to OZH –

14              (a)     June 10, 2024, $2,391.00[5]
15              (b)     August 5, 2024, $4,804.73

16          This totals $7,195.73.[6]
            …
17          From June 11, 2024, through September 12, 2024 (94 days), the Debtor lived at the
18          Premises and incurred rent, utilities and other lease charges in the total sum of
            $11,715.19.  This included rent of $7,271.84 (94 x $77.36 = $7,271.84), $478.99
19          for utilities, and $400.00 for late fees (for June 2024, July 2024, August 2024 and
            September 2024), $2,821.00 for legal fees, and $743.36 for move-out turn over
20          charges.

21

22  December Solis Decl., ¶¶ 4, 11 and 12.

23          On January 6, 2025, Debtor belatedly filed his declaration in response to the December

24  Solis Decl. (the "January Bowers Decl.") [doc. 42].  In this declaration, Debtor states, in

25  pertinent part:

26

27  _____
    [5] *See* footnote 4.
28  [6] Taking into account the typographical error referenced in footnote 3, the total amount OZH allegedly received
    postpetition is $7,123.73.

I submitted the third and final payment of the stipulation on July 1st, 2024, along with form 101B – Statement About Payment of An Eviction Judgment Against You – and a letter requesting the full reinstatement of my lease to the landlord.

…

Upon and after filing bankruptcy, I paid a total of $9,944.73[7] to the landlord:

    a.    $2,319.00 for July 2024 rent on June 10, 2024 (as part of the petition and form 101A filing)[8]

    b.    $2,485.00 for August 2024 rent and utilities on August 3, 2024

    c.    $2,319.73 for September 2024 rent on September 1, 2024

I understand that Ms. Solis contends that I owe $400.00 for late fees. The leasing office failed to apply these payments to my account until after evicting me, although I paid my rent on time. As such, I should not have incurred any further late fees.

I understand that Ms. Solis contends that I owe legal fees in the amount of $2,821.00, however, legal fees related to the UD Action and the Stipulation were included in the bankruptcy petition. Further, the lease agreement states that legal fees would not exceed $1,500.00.[9]

January Bowers Decl., ¶¶ 7 and 9-11.

## II.    LEGAL AUTHORITY

### A.    *Automatic Stay Under 11 U.S.C. § 362*

11 U.S.C. § 362 provides, in pertinent part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title...operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

---

[7] Debtor's statement that he paid a total of $9,944.73 to OZH upon filing the Case and postpetition is contradicted by the amounts Debtor lists immediately after this statement, which total $7,123.73. *See* January Bowers Decl., ¶ 9.

[8] To the extent that Debtor contends he is not responsible for paying any rent due for June 2024, such contention is not well-taken. To invoke the temporary stay under 11 U.S.C. § 362(l), Debtor was required to, among other things, deposit "with the clerk of the court, **any rent that would become due during the 30-day period after the filing of the bankruptcy petition.**" 11 U.S.C. § 362(l)(3)(D) (emphasis added). Given that Debtor filed the Case on June 10, 2024, the rental deposit in the amount of $2,319.00 constituted rent that came due during the period of June 11, 2024 through July 11, 2024.

[9] The Lease Agreement provides that attorney's fees and costs of litigation would not exceed $1,800.00. *See* Lease Agreement, attached as Exh. A to the November Solis Decl., p. 9.

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secured a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or a recover a claim against the debtor that arose before the commencement of the case;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor;…

**B.    *Exception to the Automatic Stay Under 11 U.S.C. § 362(b)(22) and the Temporary Stay Under 11 U.S.C. § 362(l)***

Pursuant to 11 U.S.C. § 362(b)(22), a bankruptcy petition does not operate as a stay—

[S]ubject to subsection (l), under subsection (a)(3), of the continuation of any eviction, unlawful detainer action, or similar proceeding by a lessor against a debtor involving residential property in which the debtor resides as a tenant under a lease or rental agreement and with respect to which the lessor has obtained before the date of the filing of the bankruptcy petition, a judgment for possession of such property against the debtor[.]

11 U.S.C. § 362(l) provides, in relevant part:

(1) Except as otherwise provided in this subsection, subsection (b)(22) shall apply on the date that is 30 days after the date on which the bankruptcy petition is filed, if the debtor files with the petition and serves upon the lessor a certification under penalty of perjury that—

(A) under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment for possession was entered; and

(B) the debtor (or an adult dependent of the debtor) has deposited with the clerk of the court, any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

(2) If, **within the 30-day period after the filing of the bankruptcy petition**, the debtor …complies with paragraph (1) and files with the court and serves upon the lessor a further certification under penalty of perjury that the debtor (or an adult dependent of the debtor) has cured, under nonbankruptcy law applicable in the jurisdiction, the entire monetary default that gave rise to the judgment

under which possession is sought by the lessor, subsection (b)(22) shall not apply, unless ordered to apply by the court under paragraph (3).
…

(4) If a debtor, in accordance with paragraph (5), indicates on the petition that there was a judgment for possession of the residential rental property in which the debtor resides and does not file a certification under paragraph (1) or (2)—

   **(A) subsection (b)(22) shall apply immediately upon failure to file such certification, and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; …**

11 U.S.C. § 362(l) (emphasis added). *See also* Local Bankruptcy Rule 4001-1(f).

"[S]ection 362(b)(22) provides an exception to the automatic stay." *In re Arrieta*, 612 B.R. 342, 346 (Bankr. D. S.C. 2020). "Nonetheless, the Bankruptcy Code provides an 'exception to the exception' of the automatic stay by allowing debtors who are tenants in a residential lease to obtain, in essence, a temporary 30-day stay (with the possibility of obtaining an extended stay) through the certification process of § 362(l)." *Id.*, at 346-47.

Under § 362(l)(2), the exception to the automatic stay under § 362(b)(22) shall not apply for the entirety of the case…if within the first 30 days after the filing of the petition, the debtor: (1) complies with the initial certification process under § 362(l)(1), (2) cures the entirety of the monetary default that resulted in the judgment of possession, and (3) files a further certification with the Court that the cure payment has been made to the landlord. The failure to file this further certification results in the application of the exception to the automatic stay under § 362(b)(22) upon the 30th day after the filing of the petition, which would allow the landlord to resume eviction proceedings.

*Id.*, at 347.

Section 362(l)(4) provides that if a debtor does not file the certifications required by section 362(l), the exception to the stay found in section 362(b)(22) takes effect immediately, and the automatic stay does not apply to the continuation of an eviction proceeding. *See In re Simpson*, 642 B.R. 255, 256 (Bankr. D. S.C. 2022); *see also In re Jackson*, 2013 WL 3956994, at *3 (Bankr. D. Colo. July 30, 2013) (noting that temporary stay under section 362(l)(1) is

immediately lifted 30 days after petition date if debtor fails to file certification under section 362(l)(2)).

Section 362 is inflexible with respect to the deadline for the debtor to cure the entire monetary default that gave rise to the judgment and filing and serving the required certification on the lessor. *In re Parker*, 2008 WL 2081536, at *2 (Bankr. D. D.C. May 8, 2008); *see also Simpson*, 642 B.R. at 257 ("There is no indication from that statute that the time for filing the certification can be extended."); *In re Good*, 2015 WL 6125523, at *3 (Bankr. D. D.C. Oct. 16, 2015) (holding that section 362(l)(2) does not authorize the court to extend the 30–day postpetition deadline). A certification filed outside of the initial 30-day postpetition period is too late to trigger the protections of section 362(l)(2). *See Parker*, 2008 WL 2081536, at *2.

### C.    *Lessor's Ability to Exercise Setoff Against Security Deposits*

11 U.S.C. § 553(a) states, in pertinent part:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case…

As concerns the application of section 553(a) to security deposits, in *In re Zeinel Furniture, Inc.*, 13 B.R. 264 (Bankr. E.D. Wis. 1981), the court explained:

> The rights to parties to real estate leases are governed by state law unless there are contrary provisions in the Bankruptcy Code.  The landlord's right to set-off the security deposit with the tenant's obligations under the lease agreement is established by Section 553 of the Bankruptcy Code.  Section 553 creates a right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case against a claim of such creditor against the debtor that arose before the commencement of the case.

*Id.* at 265-66.  In *Zeinel Furniture*, based on section 553(a), the court held that the landlord's security deposit could be offset against, among other things, the rent accrued at the time of the debtor's filing of the petition and the charges for utilities and common area charges as provided

in the lease. *See also In re Pal-Playwell*, 334 F.2d 389, 392 (2d Cir. 1964) (holding that landlords were entitled to set off lease security deposit made by bankrupt tenant against landords' claim for tenant's use and occupation and rubbish removal).

Regarding a lessor's use and application of a security deposit for residential real property, Cal. Civ. Code § 1950.5(b) provides, in relevant part:

> As used in this section, "security" means any payment, fee, deposit, or charge, including, but not limited to, any payment fee, deposit, or charge…that is imposed at the beginning of the tenancy to be used to reimburse the landlord for costs associated with processing a new tenant or that is imposed as an advance of payment of rent, used or to be used for any purpose, including, but not limited to, any of the following:

> (1) The compensation of a landlord for a tenant's default in the payment of rent.

> (2) The repair of damages to the premises, exclusive of ordinary wear and tear, caused by the tenant or by a guest or licensee of the tenant.

> (3) The cleaning of the premises upon termination of the tenancy necessary to return the unit to the same level of cleanliness it was in at the inception of the tenancy. The amendments to this paragraph enacted by the act adding this sentence shall apply only to tenancies for which the tenant's right to occupy begins after January 1, 2003.

> (4) To remedy future defaults by the tenant in any obligation under the rental agreement to restore, replace, or return personal property or appurtenances, exclusive of ordinary wear and tear, if the security deposit is authorized to be applied thereto by the rental agreement…

Security deposits are intended to afford creditors some form of protection against a debtor's nonpayment; a landlord may offset a security deposit against landlord's prepetition claim arising from the debtor's lease. *In re Condor Systems, Inc.*, 296 B.R. 5, 19 (B.A.P. 9th Cir. 2003).

### D. *Discharge Injunction Under 11 U.S.C. § 524(a)*

Under 11 U.S.C. § 524(a), a discharge "operates as an injunction against the commencement or continuation of an action ... to collect, recover or offset any [discharged] debt as a personal liability of the debtor." 11 U.S.C. § 524(a)(2). "[S]ection 524(a) may be enforced

by the court's contempt power under 11 U.S.C. section 105(a)." *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002).  A bankruptcy court "may hold a creditor in civil contempt for violating a discharge order where there is not a 'fair ground of doubt' as to whether the creditor's conduct might be lawful under the discharge order." *Taggart v. Lorenzen*, 587 U.S. 554, 565, 139 S.Ct. 1795, 204 L.Ed.2d 129 (2019).

In *In re Mellem*, the Ninth Circuit Bankruptcy Appellate Panel, explained: "[t]he *Taggart* refinements of the civil contempt standard in the bankruptcy discharge context did not otherwise alter a movant's threshold burden of going forward.  The moving party still must show at the outset that the alleged contemnor: (1) knew the discharge injunction applied; and (2) *intended* the actions that violated the injunction." *Id.*, 625 B.R. 172, 178 (B.A.P. 9th Cir. 2021) (citing *In re Marino*, 577 B.R. 772, 782-83 (B.A.P. 9th Cir. 2017), *aff'd in part & appeal dismissed in part*, 949 F.3d 483 (9th Cir. 2020)) (emphasis added); *see also In re Ragone*, 2021 WL 1923658 at *5 (B.A.P. 6th Cir. May 13, 2021) ("The contempt inquiry is a two-step one….First, a court must determine whether the creditor's actions violated the discharge injunction.  Second, the court must determine 'whether there was any objectively reasonable basis for believing that the [action] did not violate the discharge'").

## III.    ANALYSIS

### A.    *Application of 11 U.S.C. § 362(b)(22) and (l)*

In order for the temporary stay under section 362(l)(1) to have been extended past the initial 30-day postpetition period, Debtor would have had to certify that he cured the entire monetary default that gave rise to the Stipulated Judgment within the initial 30-day postpetition period.  *See* 11 U.S.C. § 362(l)(2).

The Case docket reflects that 30-day postpetition period passed without Debtor providing the required certification under section 362(l)(2).  Although Debtor filed the Payment Statement on September 6, 2024, this was untimely, and the deadline for such filing cannot be extended. *See Simpson*, 642 B.R. at 257 (denying debtor's request for extension of time to file certification); *Good*, 2015 WL 6125523, at *3; *Parker*, 2008 WL 2081536, at *2 (same).

-17-

Moreover, Debtor did not provide a proof of service evidencing that he timely served the

Payment Statement on his OZH.  As a result, on July 10, 2024, the exception to the automatic

stay arising under section 362(b)(22) took effect. Consequently, in August and September 2024,

OZH was not required to obtain relief from the automatic stay in order to effectuate Debtor's

eviction.  *See* 11 U.S.C. § 362(l)(4)*; Simpson*, 642 B.R. 255, 256; *Arrieta*, 612 B.R. at 347;

*Jackson*, 2013 WL 3956994, at \*3.

Even if Debtor had timely filed and served his certification under section 362(l)(2),

Debtor has not demonstrated that he cured the entire monetary default within the mandatory 30–

day window.  OZH acknowledges that Debtor made the first two payments set forth in paragraph

2 of the Stipulated Judgment.  However, OZH disputes that Debtor made the required third

payment of $5,767.91.  Although Debtor has submitted a copy of a receipt for certified check in

that amount dated July 1, 2024, OZH asserts that it did not receive the certified check. November

Solis Decl., ¶ 9.  Debtor has not provided convincing evidence that he sent the certified check to

OZH or Greystar within 30 days of the filing of his chapter 7 petition.

After Debtor provided the required postpetition rental deposit to the Court, it appears that

Debtor did not send additional payments to OZH or Greystar until on or around August 3, 2024.

*See* Exh. I to the November Bowers Decl.[10]  If Debtor intended to have this payment applied to

his prepetition monetary default (rather than to his postpetition payment obligations under the

Lease Agreement), this is outside of the applicable 30-day deadline for Debtor to cure that

default.  Furthermore, the aggregate amount which Debtor paid in August 2024 was less than the

amount necessary to cure the remaining monetary default set forth in the Stipulated Judgment,

i,e, $5,767.91.  As such, Debtor's attempted section 362(l)(2) certification was both untimely and

incorrect.  *See Parker*, 2008 WL 2081536, at \*3 n. 1.  Because of these deficiencies, OZH did

not violate the automatic stay when it: (1) caused the Notice to Vacate to be posted on August 16

and 20, 2024; (2) sent, through its agent Greystar, the August 28 Email to Debtor inquiring as to

---

[10] OZH represents that on August 5, 2024, it received money orders from Debtor totaling $4,804.73. November
Solis Decl., ¶ 8; December Solis Decl., ¶ 11.

whether Debtor still resided at the Property; and (3) caused Debtor to be evicted in September 2024.

### 1. Debtor's Personal Property

Debtor contends that OZH violated the automatic stay by removing, or causing another to remove, Debtor's personal items from the Property on September 25, 2024. Despite contrary statements in his bankruptcy schedule A/B, Debtor represents that the value of those items was $5,000.

Because the Case was closed on September 24, 2024, there was no automatic stay in place regarding Debtor's personal property as of September 25, 2024. *See* 11 U.S.C. § 362(c). Moreover, Debtor's contention regarding the value of any personal items removed from the Apartment is contradicted by his bankruptcy schedules.

In his schedule A/B, Debtor does not identify an interest in any of the items listed in the Missing Items Letter. Rather, in his schedule A/B, Debtor represents that the aggregate value of his personal property, including a couch, a TV, a cell phone, a laptop, clothes and shoes, costume jewelry, cash and an EDD Money Mart card, is $1,230.00.[11]

### 2. The Security Deposit

Debtor has not shown that OZH violated the automatic stay by retaining the Security Deposit. After the automatic stay had terminated (based on the Case having been closed and Debtor's receipt of the Discharge), OZH was permitted to apply the Security Deposit to the prepetition indebtedness which arose from Debtor's occupancy of the Apartment and its prosecution of the State Court Action. *See* 11 U.S.C. §§ 362(c) and 553(a); *Condor Systems*, 296 B.R. at 19.

Debtor's assertion that he sent a certified check in the amount of $5,767.91 to OZH on July 1, 2024 is credibly contradicted by the testimony of Ms. Solis, an employee of Greystar. Ms. Solis has testified that these funds were never received. Other than the funds which Debtor paid

---

[11] If Debtor suffered damages in connection with any loss of his personal property in September 2024, in connection with the handling of Debtor's personal property after Debtor was evicted from the Apartment, Debtor may pursue his rights to recover such damages from OZH in state court.

in August 2024 (which properly could be applied to Debtor's postpetition occupancy of the Apartment), it appears that the only other payment OZH received from Debtor was the $2,319.00 payment which Debtor provided when Debtor filed his chapter 7 petition.  That payment was for rent that would come due within 30 days following Debtor's bankruptcy filing; it was not for payment of Debtor's prepetition debt to OZH.  *See* November Solis Decl., ¶¶ 7-8.

In light of the foregoing, the outstanding prepetition balance owed to OZH under the Stipulated Judgment appears to exceed the amount of the Security Deposit, i.e., $2,821.00. Consequently, Debtor has not shown that OZH has impermissibly retained the Security Deposit.

### 3.    *October 4 Email*

Debtor contends that OZH violated the automatic stay when it sent or caused Greystar to send the October 4 Email, which advised Debtor that "[t]here is a remaining balance of $7,176.79 that needs to be settled" and that "if the payment is not made within 30 days after receiving this notice, we will have to send your file to collections."  Exh. R to the November Bowers Decl.  The October 4 Email was sent well after the automatic stay had terminated.

Moreover, Debtor has not provided evidence that he was damaged by the October 4 Email.  Debtor's claimed damages concern the impact of his lockout from the Apartment, which took place in accordance with section 362(b)(22) and did not violate the automatic stay.  *See* November Bowers Decl., ¶¶ 7-10 and 14 ("I have suffered significant harm…stemming from the embarrassment of having eviction notices placed on my door and the stress of having to figure out my legal options and how to assert them.").  Because Debtor has not provided evidence of improper collection efforts by OZH or its agents, with respect to debt that arose before Debtor's bankruptcy filing and was subject to the Discharge, the Court will not award damages to Debtor for violations of the automatic stay.

### B.    *The Discharge Injunction*

OZH has demonstrated that the October 4 Email was sent to collect rent or charges which Debtor became liable to pay under the Lease Agreement **on or after** June 10, 2024, when Debtor continued to occupy the Apartment.  OZH has shown that, postpetition, Debtor became liable

for, at least, the following charges, totaling $8,494.19: (1) rent in the amount of $7,271.84, based on 94 days, from June 11, 2024 through September 12, 2024, at a rate of $77.36 per day; (2) utilities in the amount of $478.99; and (3) $743.36 for move-out turnover charges.  December Solis Decl., ¶¶ 4 and 12.

With respect to late fees, OZH contends that Debtor owes $100 per month for June through September 2024.  Because rent due in June 2024 was not timely paid, Debtor would be liable, on a prepetition basis, for that $100 late fee.  However, it is unclear which of the funds which OZH received from Debtor postpetition would constitute timely payments for the rent due for July through September 2024.

As concerns alleged legal fees, the Lease Agreement provides that OZH may recover from Debtor attorney's fees and costs of litigation in an amount of no more than $1,800.  *See* Lease Agreement, Exh. A to the November Solis Decl., p. 9.  Given that the Stipulated Judgement included attorney's fees in the amount of $1,535.87 and costs in the amount of $450.00, it appears that OZH may not charge Debtor for any additional legal fees or costs.

The parties do not dispute that, postpetition, Debtor paid $7,123.73 to OZH.  In the January Bowers Decl., Debtor asserts that he paid the following amounts to OZH postpetition: (1) $2,319 on June 10, 2024; (2) $2,485 on August 3, 2024; and (3) $2,319.73 on September 1, 2024.  January Bowers Decl., ¶ 9.[12]  OZH contends that it received the following payments from Debtor postpetition: (1) $2,319 on June 10, 2024[13]; and (2) $4,804.73 on August 5, 2024.  December Solis Decl., ¶ 11; doc. 8.

Debtor's statement that he submitted the third payment pursuant to the Stipulated Judgment on July 1, 2024 is belied by his above-referenced statements regarding the payments he made to OZH postpetition. *See* January Bowers Decl., ¶ 9. Moreover, as discussed *supra,* Debtor's assertion that he sent a certified check in the amount of $5,767.91 to OZH on July 1, 2024 is credibly contradicted by Ms. Solis's testimony.

---

[12] *See* footnote 7.
[13] *See* footnote 4.

Also, as discussed *supra*, OZH may properly apply the Security Deposit to Debtor's **prepetition** debts under the Lease Agreement.  Therefore, after accounting for the postpetition payments by Debtor, totaling $7,123.73, Debtor owes OZH at least $1,370.46 for rent or charges which Debtor became liable to pay under the Lease **postpetition**.  As such, with respect to the October 4 Email, the Court will not hold OZH liable for violating the discharge injunction and will not award damages to Debtor.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny the Motion.  OZH must submit the order within seven (7) days.

# # #

Date: January 13, 2025

Victoria S. Kaufman
United States Bankruptcy Judge

-22-